Hear ye, hear ye, hear ye. The United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States and this honorable court. Good morning. Judge Jordan and I are pleased to welcome our colleague from the district bench, Judge Michael Brown to assist us this week. Judge Brown is a district judge on the Northern District of Georgia and previously practiced for the Department of Justice in the United States Attorney's Offices in our circuit. And we have a custom of inviting district judges from within the circuit to sit with us after they have been on the bench for a couple of years. It gives them the opportunity to see how we do our business from this side of the bench, but it also gives us the opportunity to get to know them and hear their perspective about how our work is working out from their vantage point. So it's been a very valuable custom for the entire history of this court. We now have a caseload that enables us to manage our work without having to import visiting judges from other circuits. And we're very grateful for that. But it is very valuable for us to have the opportunity to sit with the district judges from within our circuit. So Judge Brown, thank you for joining us this week and for agreeing to help us out with our work on top of the work that you already have. It's not like he'll get a break this week from his district docket. He's taking on this extra work this week. Thank you. Counsel, we're familiar with your cases this morning. We have four appeals to hear. We've read your briefs. We've read the authorities cited in your briefs. We've done some beyond that ourselves and looked at at least portions of the record, particularly the portions that we think are the most relevant for this morning. So you have limited time. You should feel free to get straight to the heart of your argument when it is your time. Pay attention to the clock. Be mindful that when it expires that it's time to end your argument. If you're answering a question from the court, though, you will be able to finish your answer without invading any rebuttal time if you have rebuttal time. So our first appeal this morning is Stancil versus Mr. Phelps. Thank you, Your Honor. Chief Judge Pryor, Judge Jordan, Judge Brown, good morning, and may it please the court. I want to get right to the point that Your Honor has issued a letter last week relating to the Fugitive Disentitlement Doctrine. I wanted to address that first. The doctrine should not apply here, cannot apply here, because there's not a sufficient connection between the criminal matter and the matter before this court based on the Supreme Court's holdings in Ortega v. United States and Deegan v. United States. And taken together... That's the only one fact that is common. He is a fugitive, right? Your Honor, we understand the court's rulings on inferring fugitivity from failure to return, but we think it's especially unjust here, where the evidence is that López Beyo left prior to the imposition of the OFAC sanctions in 2017 and couldn't return because the United States stripped his visa. But we understand the court's rulings on fugitivity. But I think the larger point is in Deegan... And under those rulings, he is a fugitive. We would say that, again, we think it would be an improper application, but yes, we don't think there's any real argument there. But Deegan v. United States and Ortega, those cases, the Supreme Court cases taken together stand for the principle that this extreme doctrine can't be invoked if the fugitive is not a fugitive, if the individual is not a fugitive in the court invoking the doctrine. And more importantly, the fugitivity doesn't risk delaying the case or frustrating the merits by eliminating enforcement. The idea here is you can't use your fugitivity as both a sword and a shield. It's simply just not the case here. Not only was the fugitivity not in the court invoking the doctrine, but it also didn't risk any sort of delay or frustration in the plaintiff's case. In fact, it proved no impediment whatsoever in the turnover of over $106 million in properties and accounts. And as such, this is distinguishable from this court's decision in N.R.V. Martin, where this court found that the claims there each sprang from the family court proceeding from which the litigant fled and created a heads-I-win, tails-you'll-never-find-me situation of frustrated enforcement. It's also distinguishable from the U.S. There is a heads-I-win, tails-you-lose kind of problem here, isn't there? I mean, his assets, these assets have been blocked by virtue of the designation. And both proceedings are rooted in that designation. And it really has nothing to lose by appearing here to challenge execution against that property by these victims. So what's there to lose? But in the context of the criminal proceeding, by appearing, he's got everything to lose. Right. But again, this is the principle in Ortega. That court is the only court that could really which, as in Ortega v. United States, they described, there might even be any sort of contentious disrespect. The idea is you can't accept an expansion of the reasoning so that if there's any disrespect for any aspect of the judicial system that you invoke the doctrine. It's only the act of defiance that occurs solely within its domain. That's the language in Ortega v. United States reversing the 11th Circuit decision invoking the doctrine. I also want to point out FDIC v. Farron, 178 F3rd 1159, 11th Circuit case from 1999, says it very clearly. You can't use this doctrine against the defendant. That's the difference between that case and the N.R.V. Martin case. Because the Farron panel reasoned that if you were going to hold otherwise, you would invite plaintiffs to target fugitives for lawsuits because they know that the courts wouldn't allow the fugitives to defend themselves. What Farron says is you don't impose the doctrine on a civil defendant. The district court below couldn't have done it under FDC v. Farron. Again, as we point out, the key cases, Deegan, are a number of appellate courts, which we can, if the court would like, we can ask for more full briefing if the court would find it helpful. Enrique Hupperstein is a really critical case from the First Circuit back in 2019. That's 943 F3rd 12. It goes through the analysis of Ortega and Deegan and collects a number of cases where the doctrine was appropriate, where it wasn't. But the bottom line is where the absence doesn't frustrate the judgment, it doesn't really affect the court's ability to carry out its judicial business, this doctrine should not be addressing this issue. But I would like to hear a little bit from you with regards to your contention, that there are issues of fact, which precluded entry of judgment against your client. Certainly, Your Honor, Judge Jordan, the issues of fact, first of all, are that there were credibility issues. It's black letter law, you cannot trial court nor can the magistrate court make credibility determinations based on what was the summary judgment motion. That's how the plaintiff styled it. There were serious issues about whether reports were plagiarized. There were serious issues about the basis that these individuals had to testify. Quite honestly, our point is that under the cases involving 7707, the Florida rule, essentially, you've got to come with admissible evidence, it can't be hearsay evidence, it can't be conclusory evidence. And that's all the plaintiffs presented. Quite honestly, under the case law relating to what burden they maintained under 77.072, they had the burden all along, they had to prove every fact in that writ by preponderance of the evidence with admissible evidence, we don't think they provided any of it. But so we raised a number of issues that should have precluded summary judgment, the court so found it. And Mr. Lopez Bayo provided a conclusive affidavit that point by point, unlike the case in that the court cited, which I believe is, and I apologize here, the Stein case. Unlike the Stein case, Mr. Lopez Bayo point by point disputed every single allegation, he was entitled to do it. I thought I thought that the magistrate judge and then the district court believed at least in part, that some of those denials by Mr. Lopez Bayo were conclusory, and not in time not entitled to acceptance. Correct. And that's, that's wrong under the 11th Circuit case law under that Stein case, even a self serving and uncorroborated affidavit can create a genuine issue of material fact. No, no, that's, I think that's a correct statement of law. But the question is, was the affidavit so conclusory, that what it was devoid of probative value? In your honor, I would say it was not it was no more conclusory than the experts statements, where they would say, Hey, we heard about Mr. Lopez coming up in a meeting, but I'm not going to tell you who told me, I'm not going to show you the report, you have to trust me on it, counsel is essentially the attitude that they took. This was on a par with the same evidence. And again, I'd like to caution the court and explain that the burden was on him the entire time. And the second issue is, well, yes, let's assume that that I agree with you that that that affidavit was had enough non conclusory assertions of fact as to create a genuine issue. Is the error though, harmless? Because the district court took evidence, and the evidence ended up being undisputed? Well, your honor, the evidence was all disputed. Because again, the only person who testified from personal knowledge was Mr. stanza was sorry, was Mr. Lopez Bayer. And I should point out at the end of the hearing, he submitted an app. He didn't appear live. That's correct. He submitted an affidavit. And by the way, my guess is he won't. What your honor, I wouldn't wouldn't bear to speculate on that point. But I larger point is he's the only one with personal knowledge. And what I would say is the court found that telling me that if we remand this, he's going to appear live. Your honor, we don't know he very well is possible that he may, he may he may make that decision. But again, you what you have here is the magistrates found that there was more than a scintilla of evidence. And then he got mistaken in the standards, turn things around. And that was an error. He should have, there should have been at least a minimum of trial. Was that there? Was that there an evidentiary hearing? Your honor, there was an evidentiary hearing. But again, that's not that's not sufficient due process. Again, after that evidentiary hearing, he found that there was more than a scintilla of evidence. And so that means that you need to have a trial under the Zelaya case. Well, your real your real argument, it seems to me is not that that process was a violation of the Constitution. But that the Florida statute under these circumstances requires a jury trial. That's absolutely correct. That the Florida statute acts almost like rule 56. And that if you have a genuine issue of material fact, the Florida statute entitles to a jury trial, and doesn't let the district court make findings of fact on disputed evidence. That's the argument, right? That's exactly correct. And in fact, the plaintiffs essentially conceded that, that summary judgment standards apply, since they style their motion as a summary judgment motion. Yeah, I go back to my point, which is that when you have the opportunity for, for evidence, and you have an evidentiary hearing, all the evidence that comes in is undisputed at that point. No, the evidence aside the affidavit. I mean, that's hearsay. It may create a genuine issue that would entitle you to a trial, you're not going to be able to use that at the evidentiary hearing. But your honor, neither the point was neither should any of those other experts that was not admissible, that was not admissible. And under the plain language, and the case law under 7707, that should not have been admitted, there should have been a trial at the very least, that's what we're entitled to. Quite honestly, they didn't bear the burden of proving every fact in the writ. Your honor, I do want to raise in my limited time, this issue about timing. Okay, the TRIA statute talks in the present tense. The reason I mean, our 2014 Stansell ruling just guts that argument. Except your honor, that was never raised in that argument. The court never considered it's really dicta. The court never considered the implications of timing. No one raised old food. No one raised these specific issues. And let me if I can just if I may, certainly certainly contemplate that that that that decision certainly contemplates that it is not does not have the temporal restriction that you argued it does. I seem to your honor, I disagree because the statute itself says that if I make you know, you can finish your answer. shall be the subject. It's not in the past tense. This squares with Stansell ones is interpretation. Can your honor hear me? We can now you had a little momentary interruption. I apologize. The plain language of the statute says it shall. Congress if they wanted to could have said a a current or prior agency or instrumentality. In fact, in a companion statute that the Second Circuit in Calderon versus Cardona found is part of the entire statutory structure in a in a parallel statute. Congress was very clear, it said that, that basically a if I apologize, that a foreign state that is or was a state sponsor shall be liable. So Congress knows exactly how to make it put it in the past tense. Under dole food jurisdiction depends on the state of things as the time the action is brought. That's what this court in Stansell one did with respect to the blocking of property. It said we're going to measure the blocking of property under OFAC at the time. Okay. And I should say then we don't want to create a circuit split with Kirshenbaum, the Second Circuit where they very clearly held. Well, we'll see about that. Thank you, Mr. Felch. You've saved a few minutes for rebuttal, Mr. Rosenthal. Good morning, your honors. May it please the court, Richard Rosenthal on behalf of the appellees. Your honors, I want to turn to the fugitive disentitlement doctrine and the questions that Chief Judge Pryor posed. But before I do, I want to make an important point off the top, which is we are very confident in our position on the legal merits and all of these appeals. And so we'd be perfectly happy to have this court base its an affirmance based on the equitable doctrine of fugitive disentitlement, or on all the legal bases in our brief, or both of them as alternate bases for affirmance. But turning... It's not entirely clear to me that we can apply the doctrine here. I'm the one who raised the question. I'm responsible for the memo from the clerk. But if you think it does apply, give me your best argument in response to what he said about it before we move on to some of the other issues. Because I, like Judge Jordan, I think you may have some problems with this issue of fact. Yes, your honor. And I'll be the first to acknowledge this is not a clear application of the doctrine. But I do think it applies. You've asked us about the three elements, and I believe the fugitive element has been conceded by my brother at the bar. He takes issue with the nexus requirement. And your honor, I'll maybe speak to both of those two, the latter two elements. As to the nexus, the reason that OFAC sanctioned Mr. López-Beo is that he was helping El Asimi, the corrupt Venezuelan government official, by acting as his front man and laundering his drug proceeds. That's why these assets were blocked in the first place, and that's why we're all here today. And he's a fugitive from the criminal charges in the prohibited cash, and to evade the OFAC sanctions and fly them both out of Venezuela to places like Russia and Turkey. So there's an absolute nexus. And his fugitive status does frustrate and delay the criminal justice system in New York and what we are doing, not only in this court, but around the country. And if I can just give three or four examples, and then of course, I want to turn to the discussion of the Ferran case that was asked about. Here's a few ways in and engaging in a heads-I-win, tails-I'm-out-of-here sort of situation. First, he submits to Magistrate Judge Torres for the evidentiary hearing these affidavits, and we'll talk about those in the context of whether a jury trial was required. But he submits these affidavits, which engages in one-way gamesmanship because we can't cross-examine him. We object at the time and say we can't cross-examine an affidavit. So he gets a one-way version of his testimony. That's gaming the system. Second, at the evidentiary hearing, and this is at pages 206 and 207, it's docket entry 230, pages 206, 207, his counsel makes a statement very similar to what Mr. Fels said today at oral argument. He says, quote, if those sanctions, the OFAC sanctions are lifted, we intend to produce Lopez-Bello for the court and for cross-examination, and that's in process, end quote. What he's referring to is a case he filed in district court in Washington, D.C. seeking to be delisted. So we said, okay, if he's seeking to be delisted, at least present whatever evidence he presented to OFAC in order to be delisted. Well, we can't come to find out only last month because there's filings up in Washington, and this is the district court, the D.C. case 21-1727. We were not privy to what was filing with OFAC, but then the deputy director of OFAC files an affidavit last month, and what does Mr. Lopez-Bello, what was he filing? He filed 13 internal requests with OFAC for extensions of time. They sent him a questionnaire saying, fill out these questions, tell us why we should delist you, and all he filed was 13 requests for extensions of time, and then when the time finally came, he voluntarily dismissed his administrative petition. He's still got the federal district court case going in Washington before Judge Walton, but all he was doing behind the scenes was delaying. So he's gaming the system up there as well. That was number two. The third way he's prejudicing us is he's filing multiple repetitive frivolous motions for stay, for injunctions. One of them is for a case management conference. One of them is called to preclude issuance of an order, whatever that means, and the magistrate judge warned him about this in docket entry 292 saying, these things are facially meritless, you're taking another bite at the same rotten apple, and he reminds counsel that frivolous or vexation filings may be sanctioned. So he's filing a lot of nonsense in Miami. And fourth, his failure to subject himself to criminal justice in New York does prejudice us because he is delaying, by the way, in New York, his co-conspirator in the sanctions evasion charge, a man named Victor Moro, has already pled guilty, the man who accepted the cash in violation of the sanctions evasion. So we know at least one side of the story, somebody accepted that money. But his refusal to stand trial in New York for the criminal charges denies us, the judgment creditors, a huge benefit. When we go around the country, and we're going to various courts around the country, including the Southern District of New York, where we've issued writs on over a hundred million dollars of his bank accounts, and we are being denied an incredibly useful chit, a very useful piece of evidence, when he claims he's just an innocent billionaire businessman in Venezuela, we are denied the ability of showing, no, he's the front man for the former vice president, he's the test of Pharaoh, and he's doing the bidding of this corrupt vice president who's laundering far cocaine. So we are being prejudiced. Mr. Rosenthal, I know you objected to his declaration or affidavit, but did you try to invoke the fugitive disentitlement doctrine below? We did not. We did not. We did say, look... Did you move to strike that affidavit? We didn't move to strike it. We objected to its introduction. And we said, there's been 28 days notice before this hearing, at a minimum, he should be appearing telephonically from parts unknown, places unknown, but he's not even here doing that. And we got the same promise that Chief Judge Pryor received today, which is, oh, if there's another hearing, maybe he'll show up. Now, at the conclusion of the hearing, Magistrate Judge Torres said, we are not holding another evidentiary hearing. This is the whole ballgame. And his counsel said, we're not asking for one, we don't want one. So Chief Judge, excuse me, Magistrate Judge Torres was bending over backwards to let him present whatever he wanted. Did they argue that they wanted a jury trial? They did. They did. And they weren't entitled one. And I'd like to flip to that in just a moment. But there's one more point on the fugitive disentitlement doctrine that I need to address with the court's permission. And that is this notion in the Farron case that was cited, that somehow the fugitive disentitlement doctrine cannot apply when the civil litigant is a civil defendant rather than a civil plaintiff. And it's true there is language in that Farron case, I hope I'm pronouncing it properly, P-H-A-R-A-O-N, that says that in general, it ought not be applied to civil defendants. And that's true. And that's why I acknowledged at the beginning of my discussion today that I don't have a clear application of the doctrine, but I do think it applies. Because that statement in Farron was not an absolute prohibition on applying the doctrine to civil defendants. And I, in my research, have found at least four instances, including two of them from this circuit, applying the fugitive disentitlement doctrine to a civil defendant. And I'll give your honors those sites. One is the Pessin case, P-E-S-I-N, Pessin versus Rodriguez, 244, Fed Third, 1250, a decision of this court in 2001 that applied the doctrine to a civil defendant in an international child abduction case. Second citation, United States versus Barnett, 129, Fed Third, 1179, from this court in 1997, applying the doctrine to a civil defendant where the government attempted to collect on a forfeiture judgment. Third case from the Second Circuit, Empire Blue Cross versus Finkelstein, 111, Fed Third, 278, Second Circuit, 1997 decision, applying it to a civil defendant in an effort to collect assets on a civil RICO judgment. And the fourth one is a district court case a little closer to home here in Miami, a decision from Judge Rieskamp called Mishkin versus Gurian Trust. I have only a Westlaw site for that, 2008, Westlaw, 708733, Southern District of Florida, 2008. It appears nobody appealed from that order. So there are instances. I stopped looking after four because I knew the court wouldn't give me more time to give you more than four sites. But this can be applied to a civil litigant. We think it does apply here. We have been prejudiced. And with that, I'll turn to the legal merits, if I may. So let me address, Judge Jordan, your questions about whether a jury trial was required, either under the Florida statute or some Seventh Amendment, if it even applies to TRIO. Well, the statute contemplates jury trials in certain scenarios, at least, right? Yes, it certainly does when there's disputed factual issues. And here we had none. Let me just frame my potential concern and then let you address it. It'll be very quick. So Mr. Lopez-Bello says that the evidence against him involved an inferential and circumstantial chain. And it played out, in his view, this way. So I want you to be able to comment on it. He was connected to Mr. El Asami. Mr. El Asami was connected to Mr. Barrera, and Mr. Barrera was connected to the FARC. And so that is, in their view, a very big inferential line of causation. It's circumstantial. You have no direct evidence. And in that context, he says that what he presented is enough to create issues for a jury. Okay. It was much more direct than that. You're right that that was one of the sources of testimony. But there was much more direct testimony. If you look at pages 115 and 175 of the hearing transcript, again, that's docket entry 230, you will see testimony from our hearsay that Mr. Lopez-Bello himself is a member of the Cartel of the Souls. And the cartel is the FARC's distribution arm in Venezuela. When the FARC distributes cocaine through Venezuela, it uses the Cartel of the Souls. It is an arm of the FARC. And the testimony was that Mr. Lopez-Bello himself is a member of that cartel. Again, pages 115. Those witnesses had personal knowledge of those facts. Yes. Mr. Crane, the DEA agent, testifies at pages 175, 190, 192, that Mr. Lopez-Bello knows that he is aiding the FARC by laundering El Asimi's proceeds from the sale of FARC cocaine. He says, the way this works, and by the way, Mr. Farah testified to the same effect, the way this works is the FARC sends its cocaine through Venezuela, in part, they send it through a lot of places. But when they send it through Venezuela, they need the protection of a government entity. And that's what Mr. El Asimi, as the vice president and now a top minister, was providing to them. Here's one problem I have. The district court said that this affidavit was conclusory. But Mr. Lopez-Bello averred that he's never been involved with narcotics drug trafficking, that he's not been a front man for El Asimi, and he's not a member of the cartel of the sons, and that he's never laundered drug proceeds for El Asimi. Aren't those all assertions of fact that create a genuine issue? No, I don't think a single one of them is an assertion of fact. I think those are conclusions. It's like a prison guard charged with a 1983 offense saying, I never beat any prisoners, I never violate anyone's civil rights. There are no... No, but if you're going to use that hypothetical, the example, I think, based on Chief Judge Pryor's question is, I didn't beat this inmate. Right. And so if you say, I mean, it's proving a negative. So if you have nothing else to add, and you say, I did not beat, did not lay hands on inmate X, isn't that enough to create an issue of fact for a jury in a 1983 excessive force case? I don't think so, Your Honor, because in this instance, the affidavit or the declaration didn't give any factual basis. It just came to the legal conclusion, I'm not laundering his proceeds. I'm not involved with him. And remember, we have... I've never been involved in drug trafficking. Right. I've never been a front man for him. I've never laundered his proceeds, drug proceeds. Right. How else does he deny what's been alleged against him? He can give facts about what his relationship is with al-Assami, or how he's made his money, or he can have a forensic audit from his CPA to say, here's what the business does. Here are its receipts. Here's how he became a billionaire, as opposed to just saying, I don't beat anyone in prison. I don't violate anyone's civil rights. Therefore, I must not have violated Mr. Jones, the plaintiff's civil rights. And I think Your Honor is right that at most, this is harmless. We have a factual finding by the Magistrate Judge Torres, then adopted by Judge Scola. And Your Honor said in the 2014 opinion, these are findings of fact, which means we get a look... But the whole question is, I mean, again, I know the analogy is not perfect, but if we're analogizing to Rule 56, the fact that a district judge made factual findings, which would be affirmed under the clear error standard, doesn't necessarily decide the issue of whether or not that judge should have made findings on disputed evidence, or should have let a jury figure out what the facts were. So I'm not sure about... In this sort of scenario, I know the analogy is not clean, but the fact that... In other words, you can't argue that in a Rule 56 case, that it's okay for the judge to have made findings of fact on disputed evidence, because any fact finder would have reached the same conclusion. That generally doesn't fly, and I'm wondering whether it has any application here. Maybe not. Your Honor, I'm well into the red, but two very quick responses. One, this court said in Stein that conclusory affidavits have no evidentiary value. The problem is not the self-serving nature. Every affidavit is self-serving to some extent. It's the conclusory nature of this, and Magistrate Judge Torres found that this was conclusory, thus had nothing to weigh on the scale. Second, as Chief Judge Pryor referred to, at most, this is harmless error. We have an evidentiary hearing. It lasts nine hours. He bends over Lopez-Beyo present whatever evidence he wants, notwithstanding our objections on hearsay. He considers everything and comes to an unmistakable conclusion, which has been adopted by the district judge. That comes with a very strong presumption of correctness to this court. Thank you, Your Honors. Your Honor. Mr. Phelps. Okay, and I think I still have three minutes. Okay. Thank you, Your Honor. First of all, absolute falsehood. There was no personal agent. What he claimed, Crane claimed, is that he heard about Lopez-Beyo through intel, but this is all hearsay. This is absolutely hit admissible, and I can say this was very similar to the other testimony. FARA said, yeah, I heard about this, but you'll have to take my word for it. The only person who provided first-person personal knowledge in this hearing or anything that was considered was the affidavit by Mr. Lopez-Beyo. That testimony wasn't considered. What you're saying is there was no testimony. Well, yes, but Your Honor, that was presented to the court. That was part of the disputed fact. In fact, that was the only first personal knowledge, first-person knowledge. It created a genuine issue of material fact. I do want to get someone who could have appeared and was never subjected to cross-examination. No, but it was admitted into evidence, Your Honor, and the point is affidavits can create, even conclusive ones, and this is the Stein case, can create genuine issues of material fact, and it's error for the court to decide that it doesn't. I want to reach some other issues. First of all, the court erred because it had the wrong assumption. You said it had an evidentiary hearing. It presumed that this court had already affirmed the agency or instrumentality and that basically he switched the burdens, made Lopez-Beyo come up with evidence to refute the initial finding. That was error. We started with a complete clean slate, and essentially, he improperly weighed the evidence. I do want to get to the indirect issue because it's a critical issue. Are you raising a new issue that hasn't been offered in your opening? Your Honor, you can't, I mean, you can't argue something that Mr. Rosenthal doesn't have an opportunity to reply. No, I know, but Your Honor, there was a conversation about indirect chains, and I wanted to make that clear. Okay. Because, okay, so look, the court below misinterpreted Stancil 1's holding on indirect connections in a way that renders it inconsistent with Stancil 1's requirement of proof that a person actually is an agency or instrumentality. When you have an any corporations or entities that he controls, that was the issue at Stancil 1, are also agencies or instrumentalities because his knowledge and his actions are imputed to the juridical entities. You just can't use the same thing when you're dealing with separate issues, separate individuals. It creates a massive substantive due process issue. And if the court upholds this finding, allowing all these multiple indirect chains with no proof of knowledge, you're going to be removing the predictability and security that have drawn foreign investments to this country. Banks who happen to have their accounts blocked for by OFAC for any reason, often to little to no concrete evidence, can have millions taken away by a creative plaintiff who can connect one account holder to another, to another individual, to a terrorist organization. And knowing your client is one thing, but you cannot possibly have the foresight to know what's happening at several chains down the road. And a result... Mr. Fels, your time has expired. Thank you. We have your case, and we'll move to the second case for today. Thank you, Your Honor.